IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JONATHAN MIRANDA, ) </br> ) </br> Petitioner, ) </br> ) </br> vs. ) </br> ) </br> JASON GARNETT, Chief of Parole, ) </br> ) </br> Respondent. ) </br> ) | Case No. 17 C 1919 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

After a 2009 jury trial in the Circuit Court of Cook County, Jonathan Miranda was convicted of home invasion and aggravated battery with a firearm and sentenced to 27 years' imprisonment. Miranda has filed a habeas corpus petition under 28 U.S.C. § 2254, arguing that the evidence was insufficient to support the jury's verdict, his trial counsel was ineffective, and new evidence shows he is innocent of the charges. For the following reasons, the Court orders an evidentiary hearing on Miranda's claim that the Court should excuse the procedural default of his ineffective assistance of counsel claim due to his actual innocence. The Court denies Miranda's claims based on the sufficiency of the evidence and freestanding actual innocence.

### Background

**A. Factual background**

The following facts taken from the state appellate court's decision on direct appeal, *People v. Miranda*, 2012 IL App (1st) 103360–U, are presumed correct under

28 U.S.C. § 2254(e)(1).

In 2007, Chicago police were investigating a drug dealer named Luis Diaz. During their investigation, police intercepted communications between Diaz and two brothers, Jason and Wellington Jaramillo, who wanted to buy cocaine from Diaz. Police recorded phone conversations in which Diaz asked the Jaramillos to kill a rival drug dealer named Froylan Lopez. The Jaramillos agreed to invade Lopez's home, rob him, and kill him.

On the evening of April 24, 2007, Diaz called Jason Jaramillo to discuss the plan. Diaz asked, "Are you going to do the job, or not?" *People v. Miranda*, 2012 IL App (1st) 103360–U, ¶ 9. Jason replied that they would do "the job" the next day and further stated that "[his] cousin is going to come around nine-thirty (9:30) [that evening] and we are going to go over [to Lopez's house] to see the whole situation." *Id.* Diaz asked about the cousin's role in the plan and Jason responded that "he is just going to drive like that we are going to give him one thousand ($1,000) just to drive." *Id.* Jason told Diaz that his cousin had a small car "that costs a lot of money, and—it's not—the car is not hot." *Id.* The cousin was never identified by name during the phone calls.

After this phone call, police observed a dark-colored Oldsmobile with a driver and three passengers drive the Jaramillos from their house to Lopez's residence. Police were unable to get a good view of any of the occupants of the Oldsmobile, but they later ran a vehicle check on its license plate and discovered that it was owned by Miranda and his mother, Digmey Jaramillo. Later that night, the Jaramillos called Diaz to discuss the layout of Lopez's house and finalize the plan for the murder. The men agreed that Wellington would dress in nice clothes and ring the doorbell with the hope that Lopez

2

would invite him inside. Diaz said, "you should look like a nice tie, you should look decent." *Id.* ¶ 10.

The next day, a police officer conducting surveillance outside of Lopez's home saw a small blue Audi TT Coupe pull into Lopez's driveway. The Jaramillos exited the vehicle and approached the house while the Audi was parked in the driveway with the engine running. Wellington was dressed in a dress shirt, tie, and dress pants; Jason was wearing a sweater and nice jeans. During this time, the Jaramillos entered the house and shot Lopez several times. About one minute later, Lopez managed to activate an alarm, and the Jaramillos "frantically" returned to the car, which then "frantically revers[ed]" and drove off with its tires "screeching." *Id.* ¶ 19. The police followed the Audi at over 60 miles per hour but were not able to catch up to the speeding car, which ran through three stop signs and a red light. The police eventually caught up with the vehicle and attempted to block it in. Officers exited the vehicle with their guns and badges out and shouted, "Police, get out of the car." *Id.* ¶ 20. The Audi reversed and "smash[ed]" into an unidentified police car, then attempted to drive off, but crashed head-on into another police car. *Id.*

The officers removed Jason and Wellington from the passenger side and Miranda from the driver's seat of the crashed car. They also recovered two guns from the back seat. Police interrogated Miranda after the crash in a recorded interview. Miranda stated that he was "not an active participant" in the events that occurred at Lopez's house, claimed that "he was just giving his cousins a ride," and he denied that the guns in the car belonged to him. *Id.* ¶ 28.

3

**B.     Trial**

The State charged Miranda with home invasion and aggravated battery with a firearm under an accountability theory of liability; Miranda ultimately pleaded not guilty and went to trial.  Several police officers and the victim, Froylan Lopez (who survived the shooting), testified to the facts above, which were largely undisputed.  The defense's key argument at trial was that Miranda had no idea that his cousins were planning to rob and kill Lopez (or engage in any type of criminal activity).  Miranda testified that the night before the shooting, he was at home with his girlfriend (Stephanie Araujo), mother (Digmey Jaramillo), and sister (Kayla Rincon)—not with the Jaramillos scoping out Lopez's residence as argued by the prosecution.  He further testified that the next day, he received a call from Jason, who was looking for his younger brother Arthuro.  According to Miranda, Jason told him that he and Wellington had a job interview with a landscaping company and wanted Arthuro to drive them there.  Because Arthuro was at school, Miranda agreed to drive them instead.  He picked up his cousins, who were dressed nicely.  He then simply followed his cousins' directions until they arrived at a house which Miranda did not recognize.  Miranda's cousins exited the car, and he waited in the car with the radio on.  Miranda testified that about a minute later, his cousins ran back to car and told him, "Drive, drive, drive, get out of here."  *Id.* ¶ 15.  At this point, Miranda realized that Wellington had a gun in his lap.  Wellington pointed the gun at him and said, "Drive, shut up and drive."  *Id.* ¶ 16.  Miranda testified that he "had no other choice" so he "backed out, and peeled out of there."  *Id.*  The ensuing police chase and crash was the result of his cousins' threats and his "panic."  *Id.* ¶ 34.  After they were arrested, Jason told him to "keep [his] mouth shut."  *Id.* ¶ 36.  Miranda

4

admitted that he had lied to police when he said he did not know who the guns in the car belonged to, even though he knew they belonged to his cousins. Miranda also "acknowledged that he never told police that he believed he was driving his cousins to an interview; rather, he merely advised the investigating officers that he and his cousins were just driving around." *Id.* ¶ 37.

Miranda's younger brother, Arthuro, testified that *he* had driven the Oldsmobile with Jason, Wellington, and a friend named Luis Madrid to Lopez's house the night before the shooting, and that Miranda was not with them. Arthuro further testified that he went to school on the day of the shooting and, after school ended, realized he had missed several calls from his cousins.

The defense named Kayla Rincon and Digmey Jaramillo as witnesses. Both state that they were available and prepared to testify during the trial that Miranda was at home the night before the shootings. Ultimately, however, Miranda's trial counsel never called either to testify. Araujo and Madrid state that they would also have testified in support of Miranda's version of events but that they were never contacted by defense counsel.

In closing, the prosecution argued that the calls intercepted between the Jaramillos and Diaz in which the Jaramillos stated that they would pay their cousin $1,000 to be their getaway driver proved that Miranda knew exactly what was going to happen. The prosecution also emphasized during closing argument that Miranda had not called his mother, sister, girlfriend, or Madrid to corroborate his version of events:

> I didn't hear from Luis Madrid. Did you? . . . They don't have an obligation to put anybody on, but if they want to convince you of the Defendant's innocence, wouldn't you think they would put him on? Wouldn't you think that Luis Madrid would be on this witness stand? I got two better for you.

5

> Jonathan Miranda sat on that witness stand and told you that his mother and his sister were alibi witnesses for the night [before the shooting], that he couldn't possibly have been in that Oldsmobile Intrigue circling [Lopez's home] earlier or later that evening because . . . he had just come home from work, he had his girlfriend over, Stephanie, and his mom and his sister. Did you hear from Stephanie? Did you hear from his mother? Did you hear from his sister to support that alibi? [. . .] You didn't hear from them. I will tell you why. The only witnesses they could call to testify are liars and convicted felons. Nobody else wanted to come into this courtroom and support that pack of lies.

Am. Pet., Ex. B at C193–94.

Defense counsel argued that there was no evidence that Miranda knew of the Jaramillos' plan. Counsel argued that Arthuro, not Miranda, had driven the Jaramillos to Lopez's house the night before the shootings, and that the "cousin" referred to in the Jaramillos' phone calls could be any of their numerous cousins, including Arthuro, because Miranda was never specified by name.

The jury found Miranda guilty of both charges. The Court sentenced Miranda to 27 years' imprisonment, which was the statutory minimum.

**C.     Direct appeal**

Miranda appealed his convictions on two grounds. First, he argued that the evidence was insufficient to support the verdict because "the State presented no evidence that he knew his cousins intended to commit a crime or that he agreed to participate in their criminal scheme." *Id.* ¶ 45. The state appellate court disagreed. The court stated that the following facts were sufficient for a reasonable juror to conclude that Miranda had knowledge of his cousins' criminal purpose and intentionally acted to aid them: (1) "Defendant's presence at, and flight from, Froylan Lopez's house after the shooting"; (2) "defendant [sat] in Lopez's driveway with his car running"; (3) "defendant drove over 60 miles per hour away from the scene . . . [and] failed to stop at three stop

6

signs and drove through a red light at an excessive rate of speed" and then crashed his car into police vehicles; (4) the phone call in which Jason informed Diaz that his cousin would act as a the getaway driver for $1,000; (5) Jason's statement that "his cousin had a small, expensive car that was 'not hot,' which fit the description of Miranda's Audi; and (6) and police surveillance's observation that "an Oldsmobile, registered to defendant" circled Lopez's house the night before the shooting.  *Id.* ¶¶ 51–52.  Although the court noted that Miranda and Arthuro had testified that it was Arthuro who had driven the Oldsmobile, the court explained that "it was up to the fact-finder to weigh the evidence, assess the credibility of the witnesses, resolve conflicting evidence, and draw reasonable inferences therefrom."  *Id.*

Second, Miranda argued that the prosecution had impermissibly shifted the burden of proof during closing arguments when it argued that Miranda "failed to call his mother, sister, or his brother's friend Luis Madrid, to support his contention that he spent the night prior to the shooting at home rather than with his cousins."  *Id.* ¶ 55.  The appellate court rejected this argument.  The court stated that "[b]ecause defendant injected the existence of these witnesses into the case" through Miranda and Arthuro's testimony regarding the events of the night before the shooting, "the State was entitled to comment on defendant's failure to call these witnesses to testify on his behalf."  *Id.* ¶ 60.  The appellate court therefore affirmed Miranda's conviction.

Miranda did not file a petition for leave to appeal (PLA) to the Illinois Supreme Court.

7

### D. Post-conviction petition

In 2013, Miranda filed a *pro se* post-conviction petition.[1] He argued that trial counsel was ineffective for failing to call his mother and sister to testify.[2] The trial court summarily dismissed the petition because Miranda did not support this claim with affidavits from his mother and sister, as required under 725 ILCS 5/122-2.

The appellate court affirmed on the same grounds. Miranda, now represented by his current counsel, filed a PLA to the Illinois Supreme Court. He also moved to file a supplemental PLA raising the sufficiency-of-the-evidence argument that Miranda had pursued on direct appeal. The motion to supplement was denied, as was the PLA.

### E. Successive post-conviction petition

In 2016, Miranda filed a successive post-conviction petition, claiming that (1) new evidence showed his actual innocence, and (2) trial counsel was ineffective for failing to call his mother, sister, girlfriend, and Madrid at trial. In support of this actual innocence claim, Miranda filed affidavits from Jason and Wellington in which they stated that they had lied to Miranda and told him they needed a ride to a job interview and that Miranda had no knowledge of their plans to shoot Lopez. They stated that they would have refused to testify to these facts at the time of Miranda's trial for fear of incriminating themselves. Miranda also presented affidavits from his mother, sister, girlfriend, and Madrid stating that Miranda was not in the Oldsmobile with the Jaramillos the night

---

[1] Miranda asserts that, following his direct appeal, he retained new counsel that "advised [him] to file a postconviction petition instead of a PLA." Pet. at 11. Miranda asserts that, his appellate counsel then "refused to file" the petition and "instead agree[d] to ghost-write a petition that [Miranda] could file *pro se*." Id.

[2] Miranda raised additional issues in his post-conviction petition but does not pursue these issues in his section 2254 petition.

8

before the shooting.

The trial court denied the successive petition, and the appellate court affirmed. Miranda filed a PLA to the Illinois Supreme Court. The Illinois Supreme Court entered a supervisory order directing the appellate court to reconsider its judgment on grounds not relevant to the present section 2254 petition. In February 2023, the appellate court issued a new ruling reaffirming its denial of the successive petition. With respect to the actual innocence claim, the appellate court stated:

> [T]he proposed testimony of the cousins, that they lied to Diaz about paying one of their cousins $1000 to be their getaway driver and did not reveal their criminal plan to defendant, is immaterial because such testimony is irrelevant and not probative of defendant's innocence under an accountability theory. Rather, the proposed testimony is cumulative because the jury heard defendant's testimony that he believed he was driving his cousins to a job interview and was not aware of their criminal plan.

*People v. Miranda*, 2023 IL App (1st) 170218-B, ¶ 28.

With respect to the ineffective assistance of counsel claim, the appellate court first held that Miranda had not established cause for failing to properly raise the issue in his original *pro se* post-conviction petition. The court also stated that Miranda could not demonstrate prejudice from trial counsel's failure to call the witnesses because their "proposed testimony involves the day before the shooting of Lopez and, at best, suggests that defendant did not drive around Lopez's house the previous night." *Id.* ¶ 32. The court concluded that "the fact that trial counsel did not call these witnesses at trial [did not] constitute[ ] an error that so infected the entire trial that the resulting conviction violates due process." *Id.*

Miranda filed a PLA to the Illinois Supreme Court, which denied the petition.

### F. Section 2254 petition

Miranda filed a timely petition for relief under section 2254 in March 2017, which this Court stayed pending the resolution of the then-ongoing state court proceedings. In July 2023, after the state court proceedings concluded, Miranda filed an amended petition. He renews three arguments raised in the state court proceedings. First, he argues that the evidence presented at his trial was insufficient. Second, he argues that trial counsel was ineffective for failing to call Digmey Jaramillo, Kayla Rincon, Stephanie Araujo, and Luis Madrid to testify on his behalf. Third, he argues that the affidavits from Jason and Wellington Jaramillo constitute new evidence that he is actually innocent.

## Discussion

A petitioner in custody under a state court judgment is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To seek federal relief, a petitioner must first exhaust state remedies by presenting each claim "through one complete round of review in state court." *Gonzales v. Eplett*, 77 F.4th 585, 590 (7th Cir. 2023); 28 U.S.C. § 2254(b)(1). If this exhaustion requirement is satisfied, a federal court may reach the merits of the petitioner's claims but must defer to "the last reasoned state court decision reached on the merits." *Gonzales*, 77 F.4th at 591. A federal court may issue a writ of habeas corpus only if that state court decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A.  **Sufficiency of the evidence**

Miranda first argues that the evidence presented at trial was insufficient to support the jury's guilty verdict because the prosecution "offered no evidence that [Miranda] intended to aid and abet the shooting, or even that he was aware of the crime until after it occurred." Pet. at 13. The State argues that Miranda procedurally defaulted this claim by failing to file a PLA after the appellate court affirmed his conviction on direct appeal. The State further argues that the claim fails on the merits because the Illinois Appellate Court applied the correct legal framework and reasonably concluded that the evidence was sufficient to support the jury's verdict.

The Court need not address the parties' various arguments regarding whether Miranda procedurally defaulted this claim and whether that default should be excused because his claim fails on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), sets out the standard for evaluating whether the evidence was sufficient to support a conviction. The Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference": deference to the jury's decision to convict and deference to the state court's decision to reject the sufficiency challenge. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, "[u]nder *Jackson*, evidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 654 (quoting

11

*Jackson*, 443 U.S. at 319). Second, the Court must defer to the state court's decision unless it was "objectively unreasonable." *Id.* at 651.

The Court concludes that the appellate court (the last court to address the issue on the merits) reasonably applied *Jackson* in this case. The court first correctly stated that, under *Jackson*, it "must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt." *Miranda*, 2012 IL App (1st) 103360–U ¶ 48. The court then explained that, under Illinois law:

> A person is legally accountable for the conduct of another when:
>
> either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.
>
> When 2 or more persons engage in a common criminal design or agreement, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability.

*Id.* ¶ 49 (quoting 720 ILCS 5/5-2(c)). The court concluded that there was sufficient evidence that Miranda had "knowledge of his cousins' criminal purpose and acted with the intention to aid his cousins in the commission of their crime against Froylan Lopez." *Id.* ¶ 51. Specifically, the court cited the following evidence presented at trial: (1) "Defendant's presence at, and flight from, Froylan Lopez's house after the shooting"; (2) "defendant [sat] in Lopez's driveway with his car running"; (3) "defendant drove over 60 miles per hour away from the scene . . . [and] failed to stop at three stop signs and

12

drove through a red light at an excessive rate of speed" and then crashed his car into police vehicles; (4) the phone call in which Jason informed Diaz that his cousin would act as a the getaway driver for $1,000; (5) Jason's statement that "his cousin had a small, expensive car that was 'not hot,' which fit the description of Miranda's Audi; (6) and police surveillance's observation that "an Oldsmobile, registered to defendant" circled Lopez's house the night before the shooting. *Id.* ¶ 51–52. In brief, Miranda fit the description of a "cousin" with a small, expensive car; another car Miranda owned was seen circling Lopez's house the night before; and Miranda acted as a getaway driver would be expected to act. The Court concludes that it was reasonable for the appellate court to conclude that these facts permitted a reasonable jury to conclude beyond a reasonable doubt that Miranda knew of his cousins' plan and intended to aid them as their getaway driver. The Court therefore would decline to grant Miranda's section 2254 petition on this basis even if his procedural default of the claim were excused.

## B. Ineffective assistance of counsel

Miranda argues that his trial counsel was ineffective because he failed to call witnesses at trial who would have testified that Miranda was home the night before the shooting and was not conducting surveillance on Lopez's house with the Jaramillos, as the prosecution contended. Specifically, Miranda argues that trial counsel should have called Digmey Jaramillo (his mother), Kayla Rincon (his sister), and Stephanie Araujo (his girlfriend), all of whom would have testified that he was at home that night. In addition, Miranda argues that trial counsel should have called Luis Madrid, who would have testified that he, Jason, Wellington, and *Arthuro* drove to Lopez's house that night

13

and that Jonathan Miranda was not with them.

The State argues that this claim is procedurally defaulted because the state court denied it based on independent and adequate state law grounds. Although Miranda raised this claim in his initial *pro se* post-conviction petition with respect to his trial counsel's failure to call his mother and sister, the appellate court held that, under Illinois procedural rules, he forfeited that claim by failing to provide affidavits from his mother and sister regarding what they would have testified to had they been called at trial. *See People v. Miranda*, 2016 IL App (1st) 131551-U, ¶¶ 26–27 (citing 725 ILCS 5/122-2). Further, when Miranda raised this claim again in his successive post-conviction petition (this time including his girlfriend and Madrid as potential witnesses who were not called), the appellate court concluded the petition was barred under Illinois law because Miranda failed to properly raise the issue in his initial *pro se* petition and had not established cause or prejudice for the default.

In response, Miranda does not dispute that he has procedurally defaulted his ineffective assistance of counsel claim. Rather, he argues that the default should be excused because he has offered new evidence that he is actually innocent. Specifically, Miranda proffers affidavits in which "Wellington and Jason Jaramillo admit[ ] that they tricked [him] into driving them to the crime scene by telling him they were going to a job interview, but did not come forward at the time because their attorneys advised them not to, on Fifth Amendment grounds." Pet. at 16.

"When a state court rejects a prisoner's challenge to his conviction on an independent and adequate state-law ground," such as a failure to follow a state procedural requirement, "the federal claim is deemed procedurally defaulted." *Garcia v.*

14

*Cromwell*, 28 F.4th 764, 771 (7th Cir. 2022). Procedural default precludes a court from reviewing a petitioner's habeas claim on the merits unless the petitioner "demonstrates either of two things." *Wilson v. Cromwell*, 69 F.4th 410, 420–21 (7th Cir. 2023). "The petitioner may demonstrate 'cause for the default and actual prejudice as a result of the alleged violation of federal law,' or he may 'demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Id.* at 421 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). The latter exception "applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *Id.*

Under these circumstances, a petitioner's "claim of innocence is . . . 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred considered on the merits." *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). A petitioner "asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup*, 513 U.S. at 327). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Wilson*, 69 F.4th at 421 (quoting *Schlup*, 513 U.S. at 324). "New evidence in this context is not 'newly discovered evidence,' but rather any evidence that was not presented at trial." *Dixon v. Williams*, 93 F.4th 394, 403 (7th Cir. 2024) (quoting *Jones v. Calloway*, 842 F.3d 454,

15

461 (7th Cir. 2016)). But although the *Schlup* standard is "demanding," *id.*, "absolute certainty about a petitioner's guilt or innocence is not required to satisfy the petitioner's burden at the gateway stage." *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010). "The reviewing court must consider all the evidence, old and new, and based on this total record, make a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *House*, 547 U.S. at 538).

The Court concludes that an evidentiary hearing is required before it can make a determination of what reasonable jurors would do in light of the old and new evidence viewed as a whole. If credible, the testimony of Jason and Wellington Jaramillo would be significant evidence in Miranda's favor. The only exculpatory explanation presented at trial for Miranda's presence in the driver's seat that day was his own uncorroborated testimony that his cousins lied to him about the purpose for driving them to Lopez's home. If the Jaramillos had testified credibly that they lied to Miranda about the purpose for the drive, that would have been significant evidence in the defense's favor. Moreover, this is not a case where their testimony would merely "add[ ] a new voice to a highly complex, and often inculpatory, evidentiary record." *Wilson*, 69 F.4th at 422. To the contrary, the evidence that Miranda knew what his cousins had planned was far from overwhelming to begin with. The Court cannot determine from the Jaramillos' affidavits alone, however, whether their testimony is credible. Instead, the appropriate first step is for the Court to hold an evidentiary hearing to determine whether the new evidence is "reliable" and then to "make a probabilistic determination about what reasonable jurors would do." *Id.*

The State argues that Miranda cannot satisfy the requirements of 28 U.S.C.

§ 2254(e) to receive an evidentiary hearing on his actual innocence claim. But the Seventh Circuit has held that these requirement "do not have to be met in order for a court to hold an evidentiary hearing on whether the petitioner has met the actual innocence threshold necessary to consider the merits of his procedurally defaulted claim." *Coleman*, 628 F.3d at 319 n.2.

Because a "gateway" actual innocence claim only permits the court to review an otherwise defaulted claim, a hearing on Miranda's evidence of actual innocence would be superfluous if his underlying ineffective assistance of counsel claim were clearly lacking in merit. The Court is persuaded, however, that the claim has potential merit. Furthermore, issues relevant to the resolution of the ineffective assistance of counsel claim—such as the credibility of the testimony of Digmey Jaramillo, Kayla Rincon, Stephanie Araujo, and Luis Madrid—potentially overlap with issues that will be addressed at the evidentiary hearing. Accordingly, the Court defers its review of the merits of Miranda's ineffective assistance counsel claim until after the hearing.

**C.    Actual innocence**

Lastly, Miranda argues that the Court should issue a writ of habeas corpus based solely on the fact that he is actually innocent of the crimes for which he was convicted. The Seventh Circuit has explained that is an "open question whether petitioners can obtain habeas relief under § 2254 based upon standalone claims of actual innocence." *Cal v. Garnett*, 991 F.3d 843, 850 (7th Cir. 2021). Although, as discussed, actual innocence can serve as a "gateway" to overcome procedural default, "the Supreme Court has never held that actual innocence claims, standing alone—separate and apart from any constitutional error—could support habeas relief." *Id.* And even if such a

17

claim could support granting a writ of habeas corpus, a free-standing substantive actual innocence claim would require "more convincing proof of innocence" than a gateway claim. *House*, 547 U.S. at 555. Specifically, in contrast to a gateway claim, which does not require "absolute certainty," *Coleman*, 628 F.3d at 319, a substantive claim "would have to fail unless the federal habeas court is itself convinced that those new facts *unquestionably* establish [the petitioner's] innocence." *Schlup*, 513 U.S. at 317 (emphasis added). Miranda has not made this higher showing. Thus even if a freestanding actual innocence claim is cognizable in a section 2254 proceeding, Miranda's claim would not succeed. The Court therefore denies Miranda's free-standing actual innocence claim.

## Conclusion

For the reasons stated above, the Court orders an evidentiary hearing to permit further development of Miranda's actual innocence claim as a gateway to excuse the procedural default of his ineffective assistance of counsel claim. The Court denies the petition with respect to Miranda's sufficiency-of-the-evidence and free-standing actual innocence claims. The case is set for a telephonic status hearing on June 7, 2024 at 9:00 a.m., using call-in number 650-479-3207, access code 980-394-33. The parties should be prepared to set a date for the evidentiary hearing. Prior to the status hearing, the parties should confer regarding the current location of the witnesses who would be called to testify at the evidentiary hearing and the logistics of getting them to court for the hearing.

Date: May 21, 2024

_____
MATTHEW F. KENNELLY
United States District Judge